Filed 4/21/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>KIMIKO KIMIO WILSON,<br><br>    Defendant and Appellant. | A163165<br><br>(Contra Costa County<br>Super. Ct. No. 50407916) |

A jury's inability to reach a verdict on the sentencing enhancement allegations for personally using and discharging a firearm in the commission of a crime does not preclude the trial court, in a subsequent Penal Code section 1170.95 petition hearing, from finding beyond a reasonable doubt that the defendant was the actual shooter.[1]

Kimiko Kimio Wilson appeals from an order denying his petition for resentencing pursuant to section 1170.95, after he was convicted and sentenced for multiple murders. He contends the order is not supported by substantial evidence and the court failed to take his youth into account.

---

[1]    All statutory references hereafter are to the Penal Code. After the trial court denied resentencing in this case, section 1170.95 was amended by Senate Bill No. 775 (2021–2022 Reg. Sess.) effective January 1, 2022. The parties do not contend the amendment affects the analysis here. Effective July 1, 2022, section 1170.95 was renumbered as section 1172.6. We refer to the statute as section 1170.95 for consistency with the record.

We will affirm the order. The evidence was sufficient for a trier of fact to conclude, beyond a reasonable doubt, that Wilson was guilty of murder as the actual shooter.[2]

## I. FACTS AND PROCEDURAL HISTORY

In 2004, Wilson was charged with two counts of first degree murder (§ 187, subd. (a)) and one count of willful, deliberate and premeditated attempted murder (§§ 187, subd. (a), 664, subd. (a)). As to each count, it was alleged he personally used and intentionally discharged a firearm in the commission of the offense, causing great bodily injury and death (§ 12022.53, subd. (b)–(d)). A special circumstance of multiple murders was also alleged (§ 190.2, subd. (a)(3)). The matter proceeded to a jury trial.

A. Trial

1. Trial Evidence[3]

On June 16, 2003, at about 8:39 p.m., DeForrest Thompson placed a 911 call reporting that two people had been shot at Triangle Court in

---

[2] Wilson also argues the evidence cited by the court was not substantial evidence of murder by an aiding and abetting theory or as a major participant who acted with reckless disregard for human life. We need not decide if there was substantial evidence to support these alternative theories as this court finds there was substantial evidence to determine beyond a reasonable doubt that Wilson was the direct perpetrator of the murders.

[3] For brevity, we derive this summary from the factual summary set forth in our opinion in Wilson's direct appeal. (*People v. Wilson* (Jul. 31, 2009, A118798) 2009 Cal.App.Unpub. Lexis 6210 [nonpub. opn.] (*Wilson*).) The parties rely on our prior summary as well. The trial court's order denying resentencing did the same, finding the summary "to accurately reflect the evidence in the trial record." We note, however, that the trial court's analysis included copious citations to the trial transcripts, confirming that the court relied on the actual trial evidence in deciding the resentencing motion. (See § 1172.6, subd. (d)(3).)

Richmond, California.  He described the lone perpetrator as young, Black, and six feet tall.[4]

Richmond police arrived at the scene and located three victims.  One of the victims was Uchenna Okeigwe, who was in the driver's seat of a black Chevrolet Caprice Classic with a gunshot wound to his head.  The driver's door was closed and its window was partially open.  An autopsy disclosed that Okeigwe had two gunshot entry wounds to the left forehead and a gunshot entry wound behind the left ear.  Gunpowder stippling near the head wounds indicated the bullets were fired from 6–18 inches away.  Okeigwe had $134.94 on his person; no drugs were found, but Ziploc bags of the type used to package drugs were hidden in the vehicle.

A second victim, Erica Young, was slumped over in the back seat of the vehicle with gunshot wounds to her back and head.  Autopsy reports disclosed that the trajectory of the bullets was consistent with being shot by someone standing outside the left passenger window while she was stretched across the rear seat of the car.  That window was shattered.

The third victim, Sheianna Babcock, was lying on the asphalt about 30 feet to the passenger's side of the vehicle, alive but bleeding profusely from her head.  The front passenger-side door was open.  Babcock was airlifted to John Muir Hospital in critical condition.

Eight bullet casings were found at the crime scene, all of which were fired from the same .45-caliber semiautomatic pistol.

*a.  Thompson's Eyewitness Account*

Thompson testified that he saw the Caprice drive up slowly at approximately 8:30 p.m.  About 15 minutes later, he heard gunshots coming

---

[4]     Wilson is Black and, at the time of the crimes, was 18 years old and stood six feet three or four inches tall.

from the direction of the Caprice and saw a young woman on the right side of the car, being chased by a man who had come from the front of the car. The woman slipped and fell. The man stood over her as she lay on her back, looking up at him with her hands extended outward, yelling something like, "I didn't do anything." The man shot her, then ran northeast toward North Richmond.

That night, Thompson described the suspect to the investigating officers as a Black male about 25 years old, six feet tall, 180 pounds. At trial, he testified that the man was 20 to 25 years old, about six feet tall, and skinny (about 180 pounds). Because Thompson's truck was elevated, his estimate of the man's height might have been distorted. Thompson testified that Wilson could have been the man he saw that night.

### b. *Babcock's Identification of Wilson as the Shooter*

On June 18, 2003, Richmond Homicide Detective Mitchell Peixoto interviewed Babcock at John Muir Medical Center. She had two tubes down her throat and could not speak. Peixoto asked her "yes or no" questions and had Babcock respond by blinking once for no and twice for yes. Using this method, Babcock indicated that she knew who had shot her, that the shooter had been in the car with her before he started shooting, he was a Black male named "Kimiko," and he lived in North Richmond.[5]

Detective Peixoto ran the name "Kimiko," and the computer returned the name of Kimiko Wilson. The police obtained Wilson's picture and determined "the description and location of where he lived . . . seemed to match." Using a computer program, police put together a photographic

---

[5] Okeigwe's brother had provided Detective Peixoto the name "Kimiko," identifying him as Okeigwe's friend and fellow student and indicating that, if Okeigwe went to Richmond, it was to see Kimiko.

lineup with persons who had similar characteristics. Peixoto returned to John Muir Medical Center and showed Babcock the lineup later on June 18, 2003. Babcock identified Wilson as the shooter, confirming her identification twice. Peixoto then showed her a single photograph of Wilson, and she twice confirmed he was the shooter.

Later that day, Babcock told Detective Peixoto she did not know who shot her. When shown the single photograph of Wilson, she shifted to a fetal position and her heart rate climbed from 70 to 106. Peixoto believed she was "in fear of her life and fear for some kind of retaliation."

At trial, Babcock testified that she could not remember the interviews at the hospital. On the day of the incident, she and her cousin Young went to Richmond with Okeigwe in his black Chevrolet Caprice. Okeigwe drove, Babcock sat in the front passenger seat, and Young sat in the rear driver-side seat. Okeigwe was on the phone several times with a person he planned to meet. At some point, Okeigwe's car was stopped in the area of other parked cars. Okeigwe, Babcock and Young were in the car. She heard shots as she was getting out of the car. She recalled being on the ground, looking up at the person who shot her. She "cried out to God and asked him to have mercy on me because I wasn't ready yet." She got a clear look at the shooter's face and had no doubt it was Wilson. Babcock believed the gun was a .45 caliber, because it looked like a police gun.

### c. Wilson's Access to a .45 Caliber Firearm

Daryl Jackson, a prosecution investigator, testified that he spoke to Ashley Jordan on June 25, 2004. Jordan said that shortly before June 16, she saw Wilson remove a semiautomatic pistol from a car parked in the friend's driveway, place it in his waistband, and walk away. The pistol was about the same size as Jackson's duty weapon, which was approximately the size of a

5

.45-caliber pistol. At trial, Jordan did not recall saying these things to Jackson.

### d. Wilson's Calls to Okeigwe on the Day of the Murder

On June 16, 2003 at 5:52 p.m. and 7:17 p.m., calls were made from Wilson's cell phone to Okeigwe's cell phone. At 8:02 p.m., a call was made from Okeigwe's cell phone to Wilson's cell phone; at the start of the call, Okeigwe's signal bounced off a cell tower in San Pablo, and at the end it bounced off a cell tower in North Richmond.

Thompson's 911 call was made at 8:39 p.m. At 8:57 p.m., a call was placed on Wilson's cell phone to an Alameda number that Wilson had called five times between 8:02 and 8:09 p.m.

### e. Evidence of Okeigwe's and Wilson's Drug Trafficking

Based on voice mail messages left on Okeigwe's cell phone, contact with a telephone number Okeigwe called on June 16, 2003, and other information, Detective Peixoto, who was qualified as an expert on drug dealing in Richmond, opined that Okeigwe was a street-level marijuana dealer and was planning to purchase marijuana on June 16, 2003. Based on documents seized pursuant to a search warrant from Wilson's room in his grandmother's residence in North Richmond, including a pay/owe sheet relating to drug transactions and a list of monetary amounts, Peixoto opined that Wilson sold narcotics.

### f. Wilson's Incriminating Response to Darlene Weaver

On June 19, 2003 at 2:56 a.m., a police SWAT team executed a warrant to arrest Wilson at his last known residence in Antioch, but did not locate him. The owner, Darlene Weaver, who was Wilson's second cousin, told police that Wilson had moved to North Richmond. Weaver testified that Okeigwe was one of Wilson's closer friends.

6

After the police visit, Weaver called Wilson at his grandmother's house and said the police were looking for him for murder. According to Detective Peixoto's account of what Weaver told Peixoto, Wilson did not respond immediately to Weaver's questions. Then Wilson said, " 'They don't have me as an accessory?' " Weaver replied, "No, they said you killed two people." Wilson then hung up the phone. Weaver immediately called back, and Wilson's grandmother said he was no longer there.

### g. Wilson's Arrest After a Car Chase

On July 9, 2003, Wilson was observed driving in Humboldt County. Two police SUV's followed and activated their flashing lights to get him to pull over. Wilson drove evasively, accelerated to 45 to 50 miles per hour, at times reached 85 to 95 miles per hour, and ran stop signs. After about five minutes of pursuit, the transmission seal blew out on his car and it came to a rolling stop. Wilson was arrested.

### h. Wilson's Defense at Trial

Wilson's defense was based on third-party culpability. He claimed that Marcus Rauls—who was deceased by the time of the trial—was the actual perpetrator and the shootings were motivated by a drug-related dispute.

Wilson testified that both he and Okeigwe sold marijuana. One of Wilson's suppliers was Rauls, whom he met just after Rauls was released from juvenile custody for murder. Rauls also supplied marijuana to Okeigwe after Wilson introduced them. Sometimes Okeigwe would ask Wilson to find Rauls to make a transaction. Typically, Okeigwe would purchase marijuana from Rauls for about $750 in cash, and they often met in Triangle Court where the killings occurred.

On June 16, 2003, Wilson and Okeigwe called each other in the afternoon. Okeigwe asked Wilson to find Rauls for him. Wilson told Rauls

that Okeigwe wanted to see him, and Rauls said to meet at 8:30 p.m. in Triangle Court. Wilson relayed the information to Okeigwe.

According to Wilson, Okeigwe picked Wilson up in his black Caprice, with two women whom Wilson did not know. Wilson sat in the rear passenger-side seat. Okeigwe drove to Triangle Court, where they waited for Rauls. Rauls approached and fired, as Wilson opened the right passenger door. Wilson ran to his grandmother's house, unaware whether anyone had been wounded. He claimed he did not call his friend Okeigwe after the incident because, "I mean, what do I call and ask? There was a shooting. I don't want to know. . . . [I]t's none of my business."

Wilson testified that Rauls later told him why he killed Okeigwe: Okeigwe was snitching to other drug dealers that Rauls was selling drugs in their territory.

After learning Rauls had been shot to death in April 2004, Wilson was willing to disclose that Rauls was the killer. Regarding the car chase that led to his arrest, Wilson said he fled because he did not have a driver's license and knew the police would find out he was wanted for murder. He acknowledged that he did not attend his friend Okeigwe's funeral or express condolences to Okeigwe's or Young's relatives. He further acknowledged that he attempted to contact potential witnesses, either directly or indirectly, in the weeks before the trial.

### i. Rebuttal

After Wilson was arrested, Detective Peixoto asked him to confirm that he told Weaver, " 'Are they looking for me as an accomplice?' " Wilson admitted making the statement.

8

Christine Rauls, Marcus Rauls's mother, testified that she saw Rauls almost daily between June 2003 and his death on August 4, 2004; Rauls never told her that he had anything to do with the killings.

Ms. Rauls further testified that Wilson had called her from jail and said he was going to send someone to talk to her. Wilson's brother Marvin appeared at her house and asked her to take a drive with him. "[Marvin] said, 'You know, um, your son and my little brother was tight, and I don't even know how to come at you with this, but could you just help his little brother out and say that Marcus did it?'" The next day, Wilson spoke to Ms. Rauls on the phone and said she should think about it and he understood it would be hard for her to say that about her son.

### 2. Prosecution Argument and Jury Instructions

In closing argument, the prosecutor relied almost entirely on the theory that Wilson was the direct perpetrator of the crimes. However, he also briefly argued felony murder culpability based on aiding and abetting a robbery. The jury was instructed on aiding and abetting liability, robbery felony murder, and accomplice liability for felony murder.

### 3. Conviction and Sentence

The jury found Wilson guilty of both counts of first degree murder and of the willful, deliberate and premeditated attempted murder of Babcock. The jury also found true the special circumstance allegation of multiple murders. The jury was unable to reach a verdict, however, on the personal use and discharge allegations.

In July 2007, the court sentenced Wilson to life without the possibility of parole on the murder convictions (staying the sentence on the second murder count pursuant to section 654) and a concurrent term of life with the possibility of parole on the attempted murder conviction.

B.  Direct Appeal

In July 2009, this Court affirmed the judgment.  (*Wilson*, *supra,* 2009 Cal.App.Unpub. Lexis 6210 at *67.)  We concluded, among other things, that there was sufficient evidence for the trial court to instruct on accomplice liability.  (*Id*. at *36–46.)  Indeed, we concluded "there was sufficient evidence to support the murder and attempted murder *convictions* on a theory of accomplice liability" and there was even "sufficient evidence to support a conviction on the *direct* perpetrator theory."  (*Id*. at *31, 45–46.  Italics added.)  In October 2009, our Supreme Court denied review.  (*People v. Wilson* (Oct. 14, 2009, S175814) [nonpub. ord.].)

C.  Petition for Resentencing

In 2018, Senate Bill No. 1437 (SB 1437) was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Gentile* (2020) 10 Cal.5th 830, 842.)  It accomplished this by, among other things, amending section 189 such that murder liability is not imposed on persons convicted of felony murder unless they were the actual killer, an aider and abettor who acted with intent to kill, or a major participant in the underlying felony who acted with reckless indifference to human life.

SB 1437 also created section 1170.95, which established a procedure for defendants convicted of murder under the old law to seek resentencing in the trial court if they believe they could not be convicted of that crime given the above amendment to section 189.  (Stats. 2018, ch. 1015, § 4.)

10

In November 2019, Wilson filed a petition for resentencing under section 1170.95.  The trial court issued an order to show cause under section 1170.95, subdivision (c), and, after briefing by the parties, held an evidentiary hearing that began on March 16, 2021.

      1.  <u>Evidentiary Hearing Testimony</u>

On behalf of Wilson, Anica Bowling testified that she dated Marcus Rauls from 2002 through 2004.  At one point, Rauls possessed a firearm.  When Rauls heard that his friend Wilson had been arrested for murder, Rauls appeared nervous.  While watching the news report, Rauls mumbled, "would you tell if you did something and the other person . . . didn't do it."

Although Rauls died in 2004, Bowling never contacted Wilson's trial attorney to report that Rauls was the actual shooter.  She claimed she was afraid to testify at Wilson's jury trial.  On cross-examination, Bowling acknowledged that Rauls never admitted complicity in the murders.

      2.  <u>Trial Court's Order</u>

On June 10, 2021, the court denied the resentencing petition by written order.  In so doing, the court considered the information, abstract of judgment, jury instructions, minute orders, trial transcript, unpublished appellate court opinion from the direct appeal, Bowling's evidentiary hearing testimony, and, because the court was the original trial judge, "its own observations of the witnesses' demeanor and credibility."

The court found that the evidence established Wilson's guilt beyond a reasonable doubt under alternative theories:  (1) Wilson was the actual killer and (2) if Rauls was the killer, Wilson aided and abetted Rauls in the murder, with the intent to kill, and he acted as a major participant in the robbery with reckless indifference to human life.

#### a. *Wilson as the Killer*

The court determined that Wilson was the actual killer based in part on the eyewitness testimony of victim Babcock, whom the court found credible. "Ms. Babcock clearly and consistently identified defendant as the shooter. Thompson's testimony in some ways corroborates her account, and does not materially refute Babcock's identification of defendant as the actual shooter. Based on the content of the testimony alone, Babcock's identification is credible and compelling and shows that defendant was the shooter. . . . Although the trial was some 14 years ago, the *court has a vivid memory of this witness. She knew what she saw, she was unwavering, and her quiet confidence was compelling*."  (Italics added.)

Further, citing to the trial transcript, the court found that circumstantial evidence supported the conclusion that Wilson was the shooter.  Wilson persuaded Okeigwe to go to Triangle Court, where Okeigwe was killed:  Okeigwe's brother testified that if Okeigwe went to Richmond, it was Wilson he was going to meet; cell phone records confirmed that Wilson made several calls to Okeigwe's cell phone that night; Okeigwe called Wilson with cell tower signals from North Richmond at 8:02 p.m., the shooting occurred at approximately 8:25 p.m., and Okeigwe did not receive further calls from Wilson's cell phone after 8:35 p.m.  Shortly before the shooting, Wilson was seen with a gun resembling a.45 caliber pistol, and forensics confirmed that a .45 caliber semiautomatic pistol was used to shoot Okeigwe and Young.  When Weaver confronted Wilson about the murder, Wilson asked whether the police thought he was an accessory (or accomplice) – indicating he knew of the murder and he was involved.  Wilson displayed consciousness of guilt by fleeing to Humboldt County after his call with Weaver, failing to show concern about his friend Okeigwe after the shooting,

12

failing to attend Okeigwe's funeral or contact his family, and evading police in a high-speed car chase when they tried to stop him in Humboldt County. Further, Wilson attempted to manufacture evidence, getting his brother to contact Rauls's mother to say Rauls was the shooter, which was "tantamount to pressuring a potential witness to give favorable evidence with the incentive that there would be no legal ramifications for Ms. Rauls' son who was already dead."

The court also rejected Wilson's third-party culpability theory: "The court does not find defendant's testimony and his third-party culpability defense to be credible. The defendant's story did not add up, especially in the face of the evidence that he was the shooter. Neither eyewitness saw anyone run from the car other than the shooter and Ms. Babcock. No one said Rauls even was there. Defendant's description of Rauls' hairstyle at the time was undermined by the testimony of Ra[u]ls' mother. . . . All these facts alone would lead the court to find his testimony not credible. In addition, however, the court observed defendant as he testified. Like Ms. Babcock, he was a memorable witness and the court has a clear recollection of his demeanor and tone when he testified. *He was among the least credible witnesses this court has ever observed.* He had an implausible excuse or story for every inculpatory fact." (Italics added.)

As to Bowling's testimony at the evidentiary hearing, the court stated: "The court finds that Bowling was not a credible witness. Her testimony lacked any specificity, was vague and changed several times in terms of how and what Rauls said to her when watching the news of defendant's arrest for murder. Moreover, her testimony as to why and how she decided to come forward at this time was evasive and utterly lacking even the most basic facts to be believed. She could not remember any details about the very event that

13

would cause her to make such a serious, life altering decision." The court continued: "Without more, the court cannot reasonably infer that Rauls' obtuse mumblings to Bowling amounted to an admission that he was responsible for shooting Okeigwe and Young. [¶] When asked questions by defendant's counsel, she was warm and cooperative. When asked questions by the Deputy District Attorney, her demeanor darkened. She became defensive, evasive and argumentative. She deflected and distracted, to avoid answering a simple and direct question. [¶] In the end, the court accords no weight to Ms. Bowling's testimony, because it is not credible and is not worth any weight." The court found it was not bound by the jury's inability to reach a verdict on the personal discharge enhancement.

The court concluded: "In sum, this court has carefully reviewed all the evidence in this case. On the face of the record, the evidence proves the defendant's guilt of murder as the shooter, beyond a reasonable doubt. The court's own observations of the witnesses—particularly Ms. Babcock, Ms. Bowling and the defendant himself—reinforces that conclusion."

### b. *Major Participant and Aider and Abettor*

The court further concluded that, even if Rauls was the actual shooter, Wilson would not be entitled to relief under section 1170.95 because he would still be guilty of murder both as a major participant who acted with reckless indifference to human life and as an aider and abettor with intent to kill.

The court found, beyond a reasonable doubt, that Wilson was a major participant in the planning and commission of the robbery: he arranged for Okeigwe to meet Rauls and directed him to the scene of the killing; he was admittedly at the scene and heard the shots; and his claim that he ran away when he heard the shots was not credible. Furthermore, the court found beyond a reasonable doubt that Wilson acted with reckless indifference to

14

human life, citing factors referenced in *People v. Clark* (2016) 63 Cal.4th 522, 622 (*Clark*)): (1) a firearm was used to shoot the victims; (2) Wilson was present during the robbery-murder but never sought to restrain Rauls or render aid to the victims; (3) Wilson knew of Rauls's propensity to kill, including that he had been adjudicated for murder and wore a gun in his waistband; and (4) Wilson made no effort to minimize the possibility of violence during the robbery-murder, but instead set up Okeigwe's meeting with Rauls, failed to call it off when he saw Babcock and Young there too, and failed to stop Rauls from shooting any of the victims, render aid, or call for medical assistance.

The court also found, beyond a reasonable doubt, that Wilson was guilty of murder under a theory of direct aiding and abetting: he had an intent to kill Okeigwe and actively assisted the killer in the commission of the murder. (§ 189, subd. (e)(2); § 1170.95, subd. (a)(3).) Wilson was the intermediary for drug deals between Rauls and Okeigwe, and he arranged for Okeigwe and Rauls to meet at the usual location at 8:30 p.m. Wilson and Rauls both intended to rob Okeigwe—and did rob him—as evidenced by the fact that Okeigwe arrived at the scene to buy drugs but was found dead without any drugs or enough money to buy them. Furthermore, Rauls had a motive to kill Okeigwe for telling rival drug dealers that Rauls had been selling drugs in their territory, and because of Wilson's close relationship with Rauls as Wilson's drug supplier, Wilson shared this motive due to his interest in ensuring Rauls was unharmed by Okeigwe's actions. Furthermore, Wilson had a separate motive to kill or rob Okeigwe because he believed Okeigwe planned to rob Wilson's relative.

The court concluded: "In the end, this is not a close case. The felony murder rule was repealed because it was harsh, and consigned people to

15

decades or life in prison for minor involvement in crimes with no intent for anyone to be hurt.  That is not this case.  Defendant was not a minor participant in a simple robbery gone awry.  Defendant shot three people, killing two.  The third lived to identify him as the shooter, again and again and again.  Even if one were to credit defendant's improbable (and convenient) story that a dead man really did the actual shooting, the evidence is overwhelming that defendant was a major participant in a dangerous armed robbery, acted at the least with reckless indifference, and in truth, shared Rauls' intent to eliminate the traitorous Okeigwe and any witnesses to that elimination.  Simply put, if Rauls was the shooter, he was not on a frolic of his own; defendant was all in with Rauls.  Accordingly, the prosecution has proven beyond a reasonable doubt that the defendant is guilty of first degree murder under the new law."  This appeal followed.

## II.  DISCUSSION

Wilson contends the court's denial of his resentencing petition was not supported by substantial evidence.[6]  In a supplemental opening brief, he argues that the matter should be remanded for consideration of his youth.

### A.  Substantial Evidence

In ruling on a resentencing petition, the trial court determines whether the prosecution proved beyond a reasonable doubt that the defendant is liable for murder as defined after amendments to the relevant statutes.  (Former

---

[6]     Wilson points out that resentencing relief is now available for persons convicted of attempted murder, and he argues there was no evidence that Wilson intended to kill Babcock.  The issue was not raised in the trial court, and it is not properly before us in this appeal.  Nevertheless, eyewitness testimony that Babcock was chased by the man who shot her as she lay on the ground, pleading for her life and Babcock's positive identification of Wilson as her shooter is sufficient evidence of Wilson's intent to kill.

16

§ 1170.95, subd. (d)(3) [prosecution must prove beyond a reasonable doubt that the petitioner is ineligible for sentencing]; § 1172.6, subd. (d)(3) [same].) We review the trial court's factual findings for substantial evidence and the court's application of those facts de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412 (*Cooper*).)

Wilson argues that Babcock's identification testimony does not constitute substantial evidence that he was the actual killer, because eyewitness identifications are inherently untrustworthy, Babcock's certainty in her identification does not mean she was right, and Thompson was unable to positively identify Wilson as the shooter at the trial (and had thought Wilson's photo in a newspaper was not a photo of the shooter).

Wilson's argument is unavailing. Thompson's inability to identify Wilson as the shooter does not mean that Babcock—who was lying on the ground as the shooter stood over her—was unable to reliably identify Wilson as the shooter. In any event, Babcock's identification testimony was buttressed by the considerable circumstantial evidence cited by the trial court. Although Wilson debates its persuasiveness, it is not our role to reweigh the evidence; substantial evidence supported the court's finding. (See also *Wilson, supra*, 2009 Cal.App.Unpub. Lexis 6210 at *31 ["We agree there was sufficient evidence to support a conviction on the direct perpetrator theory, and Wilson does not challenge the sufficiency of the evidence on this basis."].)

Nonetheless, Wilson contends the court's finding that he was the actual killer is inconsistent with the jury's inability to reach a verdict on the sentencing enhancement allegations for personally using and discharging a

17

firearm in the commission of the crimes (§ 12022.53, subd. (b)–(d)).[7]  As we observed in Wilson's direct appeal, there is a reasonable probability that one or more jurors had a reasonable doubt whether he was the shooter.  (*Wilson, supra*, 2009 Cal.App.Unpub. Lexis 6210 at *31–34.)

Appellant argues that *Cooper* applies in this case.  We disagree.  In *Cooper, supra,* 77 Cal.App.5th 393, the defendant had been convicted of first degree murder and kidnapping based on his participation with others, but was acquitted on a charge of being a felon in possession of a firearm.  In a later section 1170.95 proceeding, the trial court denied resentencing on the ground the defendant was a major participant in the kidnapping and acted with reckless indifference to human life, based in part on the court's belief that the defendant possessed and fired a gun.  The court of appeal reversed, holding that "a trial court cannot deny relief in a section 1170.95 proceeding based on findings that are inconsistent with a *previous acquittal* when no evidence other than that introduced at trial is presented."  (*Id.* at p. 398. Italics added.)  The court remanded for a new hearing to consider whether the prosecution proved beyond a reasonable doubt that the defendant was ineligible for resentencing relief for reasons other than having used or possessed a firearm.  (*Ibid.*; see *id.* at pp. 416–418; see *People v. Henley* (2022) 85 Cal.App.5th 1003, 1017–1020 [jury's not true finding on the allegation that the defendant personally used a firearm barred the court from concluding in a section 1172.6 resentencing proceeding that she did use a firearm].)

---

[7]  See section 12022.53, subdivision (b) [personally uses a firearm in the commission of the crime], subdivision (c) [personally and intentionally discharges a firearm in the commission of the crime], subdivision (d) [personally and intentionally discharges a firearm and proximately causes great bodily injury or death to a person other than an accomplice].)

*Cooper* is distinguishable.  There, a jury's not-guilty verdict established that the prosecution failed to prove beyond a reasonable doubt that the defendant possessed a firearm.  Here, the jury was *unable* to reach a verdict on allegations that Wilson personally used and discharged a firearm in the commission of the crimes.  A not guilty verdict precludes subsequent prosecution on a charge; an inability to reach a decision on an enhancement allegation does not.  While at least one juror apparently had a reasonable doubt that Wilson personally used and discharged a firearm, Wilson provides no authority that this alone would preclude the court from deciding, for purposes of section 1170.95, that the prosecution proved beyond a reasonable doubt that Wilson was the actual killer.  The question for the trial court was whether the evidence, as of the time of the resentencing hearing, established murder as now defined and beyond a reasonable doubt; it does not require the trial court to speculate how the 2009 jury might have ultimately decided the case.  (See *People v. Duchine* (2021) 60 Cal.App.5th 798, 813  ["By allowing new evidence and providing for an evidentiary hearing, the Legislature plainly intended that the issues concerning whether the defendant was guilty under theories of murder *not previously or necessarily decided* would be resolved anew, through a factfinding process affording a degree of due process to the petitioner."], italics added; Former § 1170.95, subd. (d)(3) ["At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019"]; § 1172.6, subd. (d)(3) [same].)[8]

---

[8]    Respondent argues that *Cooper* is also distinguishable because, in this case, unlike *Cooper*, additional evidence was presented at the evidentiary

19

B.  Ineffective Assistance of Counsel

We need not decide whether counsel was ineffective for not arguing Wilson's youth or whether the court sufficiently considered it.  Wilson's youth was germane to whether he acted with reckless indifference to human life, but the court's denial of the resentencing petition did not rely exclusively on the theory that Wilson was a major participant who acted with such indifference.  Because we uphold the court's order based on the trial court's theory that Wilson was the actual killer, any ineffectiveness of counsel for failing to raise the issue of Wilson's youthfulness for the major participant theory was not prejudicial, and any shortcoming in the court's consideration of the issue was harmless.  In short, remand for this purpose would be futile, as it would not change the ultimate result.[9]

## III.  DISPOSITION

The order is affirmed.

---

hearing.  As Wilson points out, however, the only evidence presented at the hearing was Bowling's testimony to the effect that *Rauls* was the shooter.  Because this further testimony did not support a conclusion that *Wilson* was the shooter, it did not add to the prosecution's evidence that the jury considered, so it provides no basis for distinguishing *Cooper*.  Respondent also contends "*Cooper* was wrongly decided because it drew conclusive analogy to the determination of whether to issue an order to show cause in the closed record situation of review of a Penal Code section 1170.126 petition to determine whether a prior offense continues to qualify as a strike."  We need not and do not decide this issue.

[9]     On July 11, 2022, Wilson filed a request that we take judicial notice of the record of his direct appeal in appeal number A118798.  We deferred our ruling pending our consideration of the merits.  The unopposed request is hereby granted.

20

 

_____

Langhorne, J. *

We concur:

_____

Jackson, P.J.

_____

Burns, J.

*People v. Wilson* / A163165

_____

&ast;  Judge of the Superior Court of Napa County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A163165 / People v. Wilson

Trial Court:       Superior Court of Contra Costa County

Trial Judge:       Hon. Mary Ann O'Malley

Counsel:     John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General of California; Lance E. Winters, Chief Assistant Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Catherine A. Rivlin and Rene A. Chacon, Supervising Deputy Attorneys General for Plaintiff and Respondent.